**CONSOLIDATION COAL COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 81–1181.**

United States Court of Appeals,
Seventh Circuit.

Submitted Nov. 5, 1981.

Decided Jan. 29, 1982.

As Corrected Feb. 2, 1982.

John R. Truman, St. Louis, Mo., for petitioner.

Elliott Moore, N.L.R.B., Washington, D. C., for respondent.

Before PELL and WOOD, Circuit Judges, and CAMPBELL,* Senior District Judge.

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

PELL, Circuit Judge.

Consolidation Coal Company (company) petitions for review of an order of the National Labor Relations Board (NLRB or Board) finding the company in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, *as amended*, 29 U.S.C. §§ 158(a)(1) and (5) (1976). The Board has cross-petitioned for enforcement. The crux of this controversy is found in a series of meetings between union and company representatives to establish an absenteeism policy for the company's employees. The union contended that an agreement on the policy was reached, which the company subsequently refused to sign in violation of sections 8(a)(1) and (5) of the Act. The company asserts that no agreement on the terms of the policy was ever reached. The principal issue presented is whether the Board's determination[1] that an agreement was, in law and fact, reached is supported by substantial evidence on the record as a whole.

I

The facts which are the basis of this controversy are for the most part not in dispute. In the hearing before the ALJ, these facts were developed primarily through the testimony of the company's mine superintendent, Roger Gann, and the union president, Jim Thomas. In our discussion of the various negotiating sessions we will, for the reasons stated hereinafter, rely basically on the version of events provided by the testimony of union president Thomas.

On January 17, 1980, Gann and his assistant, Dave Rogers, met with the union president, Thomas, and the three union committee members to negotiate a local absenteeism policy for the mine.[2] There apparently had been an absenteeism problem at the mine and Gann as the superintendent had sent out letters of reprimand. As Thomas stated, there was a need to get an absentee policy, "something that the people would know how many days they could miss." In a give and take process, typical of bargaining between negotiators, various proposals and counterproposals were made. This involved percentages of work days which could be missed before a letter of reprimand would be sent. Various steps were discussed for implementing the matter. Both parties were taking notes and Thomas told Gann at a certain point that "as far as I was concerned it was agreed to and that I would have to have it ratified at the local union meeting." Thomas further testified:

I said, "Now, Roger, we agreed on this, right?" He said yes. I said, "I don't want to take this to the union meeting and then come back tomorrow and have it changed." He said, "As far as I'm concerned we've agreed to it."

Q. Were any further meetings set?

A. Yes. We set up a meeting for the next day to tell him what happened at the local meeting.

With reference to Thomas' insistence that there be no changes, in view of the present position of the Board and the union, apparently this was a one-way street for, as Thomas testified, the membership "did basically disagree with it." This, of course, is not an unheard-of situation in the area of negotiation of labor contracts. Anyone who has followed that area of the law, including certainly the National Labor Relations Board, is cognizant of situations in which the negotiating individuals have hammered out agreements which were acceptable to both sides, and upon which there was complete agreement, only to find that an ultimate authority has found some part or even the entire agreement unacceptable. During the meeting of the union membership, that body indicated it would accept the policy agreement only if certain changes were made. These changes which significantly varied from that which had

---

1. The Board affirmed the findings and conclusions of the Administrative Law Judge (ALJ), 253 N.L.R.B. No. 104 (1980).

2. Pursuant to a collective bargaining agreement between the union and the company, local agreements between the union and individual mines could be negotiated at the individual mines.

been the agreement between the negotiating parties were: (1) Sunday and holiday work would remain optional; (2) foremen would issue slips denoting absences as excused or unexcused; (3) the absentee rate resulting in letters of reprimand would be more than 10%; and (4) the irregular work clause of the contract would not be superceded nor diminished.

The next meeting occurred on January 18, at which time Thomas and the committee members met with Gann to inform him of the proposed changes. After discussion, Gann accepted the changes emanating from the membership meeting although he had difficulty with regard to the foremen filling out slips as it would be too much additional paper work. Thomas informed him, according to Thomas' testimony, that "the local was very adamant on this particular stipulation." Thomas' version of what happened then was as follows:

After we hashed it around a little bit he [Gann] agreed that he would have the foremen do that.

Q. Was anything further said in this discussion?

A. Yes. After we got done discussing it I said, "Are you going to have it typed up?" He said yes. I said, "You'll let us know when you've got it typed up and we'll come in and sign it." He said O.K. I said, "Well, we've come to an agreement then?" He said yes. He said, "You see, we can work things out in here after all."

Again, however, a one-way street, if we accept the union and Board's present position, was involved. Thomas after the last-mentioned meeting became concerned about the exact meaning and manner of implementation of a six-month clearance provision. Apparently his concern arose from his own notes as no draft had yet been typed. On January 22 or 23,[3] Thomas and one of his committee members went to the office and discussed with Gann and David Rogers, the assistant superintendent, the particular

matter. This matter incidentally was one which the ALJ observed in his findings as having been one that Thomas, "when explaining the plan to the members, had described a provision for an employee to 'clear' his absentee record by stating, in effect, that a six-month period of time would be required of no excused absences before 'a fresh slate' could be obtained."

Notwithstanding this explanation to the membership, Thomas apparently now felt that the clause was not a good one from the union point. He asked Gann what his interpretation of the matter was and Gann in turn asked him what his was and Thomas told him. Gann had replied, according to Thomas, that that was not the way he understood it, that his understanding was the employee had to go six months from his last letter. Thomas then, according to his testimony, said he did not want to throw this absentee policy out but would like to work something out. After some discussion, a modification of this was suggested by Gann, according to Thomas, that if an employee went three more months at a certain point without missing more than 10 percent then his record would be cleared. According to Thomas:

I said, "That sounds fair to me. Roger, I appreciate it, getting this worked out. When will we have it typed up?" He said he would have it typed up the next day. I said, "I'll have a committee in here at 3:30." That was the end of the meeting.

From this testimony it does not appear there was any purpose to have the committee in the next day at 3:30 except to go over the draft for final approval. The ALJ did ask Thomas as to why he wanted the committee in. Thomas said in reply that this was so they could sign the agreement. At this point it is appropriate to observe from the record of the proceedings thus far that there is no basis for an inference that if the completed document had been presented to Thomas he would have had it signed if he had found anything in it which when re-

3. The exact date is immaterial. For purposes of simplification we will refer to this meeting as the January 23 meeting.

duced to writing was not acceptable to him or the committee.

The draft as it was typed under Gann's direction is in evidence in the case and sets forth precise details as to the four stages of the basic policy with precise provisions with regard to clearing of the work record and other allied matters on the absenteeism policy. Forms were attached also to the draft. These provisions bore directly upon the company's right to discipline including suspension of the employees for absenteeism and obviously would have been of significant interest to the employees. The fact that the document as typed is now found acceptable to the union does not, in our opinion, negate a strong inference that Thomas would not have signed it, and had no intention of signing it, if upon examination of the completed document at the time it was supposed to have been presented to him and the committee members he had found something unacceptable in it.

The ALJ expressed interest by questions at this point in the hearing as to why Thomas did not feel he had to take a draft back to the membership for ratification:

JUDGE BERNARD: You took the original agreement, though, back to the membership for ratification, remember that?

THE WITNESS: Yes.

JUDGE BERNARD: Why didn't you feel you had to take that agreement back for ratification?

THE WITNESS: Well, I never gave it much thought because I had explained to the local what my interpretation of it was, and it was a lot more lenient than what Roger's interpretation of it was. I figured this way was a half way medium and there was no local meeting scheduled for another month or two weeks, and I figured that was within my jurisdiction, to make that change.

The ALJ then asked the following leading question.

JUDGE BERNARD: You felt it was within your discretion?

THE WITNESS: Yes.

Thomas and the members of his committee went to Gann's office on the 24th but Gann did not arrive. Thomas first saw the draft as prepared by Gann on January 31, 1980, at the time of a hearing in the Federal District Court for the Southern District of Illinois. On the 25th Thomas had a meeting with Gann on the safety grievance which had no connection with the present matter. Also present at this meeting was one Anthony A. Meyer, who was supervisor of industrial and employee relations. The record apparently did not develop Meyer's relationship with the developments in the present matter despite the position he held. This was notwithstanding that on one previous occasion according to Thomas, Gann was not the only one to sit on a proposal on behalf of the company and accept it, for, according to Thomas, "Tony Meyer, the industrial relations man, was the one who signed it if I'm not mistaken." Indeed, the draft on the present policy matter which was prepared by Gann contained places for signature of himself, Rogers, and Meyer.

Thomas' testimony on the events of the 25th was as follows:

I asked Roger, I said, "Roger, where was you at last night?" He said, "I'm sorry, I forgot all about the meeting." I said, "Well, where's the absentee policy?" He said, "Shotten he's got it." I said, "What the hell is he doing with it?"

Q. Who is Shotten?

A. Shotten is the midwestern region, over all the service mines, I think.

Q. Go on.

A. He said, "He's not going to change it. He just wants to look it over." I said, "Will you get back with us when you get it?" He said yes.

On the following Monday, Thomas and one of his committee members went to the office and asked Gann where the absentee policy was and Gann replied that the company was not going to accept it. Thomas said that he responded that Gann had already agreed to the absentee policy. Gann shrugged his shoulders. Thomas and the committeemen were angry and left the office. The next day the mine went out on strike.

We have earlier noted that for the most part the evidence was not disputed and also, in accordance with the previous notation, we have addressed ourselves only to Thomas' version of what transpired. Because of the serious doubt, however, that is cast upon the Board's decision by the areas where there was contradictory evidence it is necessary that we advert to that.

Gann's memory of what occurred at the January 23 meeting differed sharply from that of Thomas. Gann testified that he had said he would have the policy typed for committee "review" the next day to see whether they had "any problems with it." He also testified:

> Right before he [Thomas] left he said, "you know, of course, I've got to get approval or clearance with the committee on this. We'll have to hold it open until I get this approval."
>
> . . . .
>
> I said, "Jim, if you're going to hold it open I'm going to have to hold it open. It's a new thing to me. We just proposed it. It came off the cuff and I'm not familiar, you know, I haven't had any experience with this. If you're going to hold it open I'm going to hold it open."

In the hearing, Thomas denied having held the matter open to check with the other committeemen and denied that Gann had said he would have to hold it open. Rice testified that he did not hear either Gann or Thomas make any statement about holding the matter open. In the district court hearing at which the company sought a temporary restraining order against the strike, Rice had testified that he did not "believe [he] remember[ed]" Gann saying he would leave it open, or at least "not in those words."

Also we note that when Thomas was testifying in the federal district court on January 31, only a week or so less after the events here involved, as contrasted to the hearing before the ALJ which occurred more than a year later, Thomas when asked whether Gann had said anything about keeping provisions of the agreement open said, "I can't recall if he did."

Also with regard to the matter of whether Shotten might change the draft which had been sent to him, Thomas in 1980 testified, as previously noted, that Gann had said that Shotten just wanted to look it over. Within the week after the events in question Thomas' sworn testimony was as follows, "And I said, 'He is not going to change it, is he?' and he said, 'No, I don't believe.'" Indeed even at the ALJ hearing when asked whether it was possible that Gann had said, "'No, I don't believe he'll change it?' or words to that effect," Thomas testified it was possible he could have said that. He did not recall the words verbatim.

## II

In reviewing a decision by the Board, the Board's order must be enforced if the Board's decision is supported by substantial evidence on the record as a whole. *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893 (7th Cir. 1981). If the record as a whole "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence," the court must set aside the Board's decision. *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) (quoted in *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir. 1977)). Similarly, the Board's individual findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e) (1976). In determining whether substantial evidence exists for the Board's decision and findings, the court must "tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Moreover, absent exceptional circumstances, credibility determinations made by the ALJ ordinarily shall not be disturbed on review. *Sarkes Tarzian, Inc. v. NLRB*, 374 F.2d 734

(7th Cir.), *cert. denied*, 389 U.S. 839, 88 S.Ct. 64, 19 L.Ed.2d 102 (1967).

■ In affirming the ALJ's conclusion that the company had violated section 8(a)(5), the Board relied upon his finding, based upon the testimony of Thomas, that there was a final unconditional agreement between the parties on the absentee policy on January 23. Initially, we note that acceptance of Thomas' version of the January 23 meeting over that of Gann was not a "credibility" determination to be accorded enhanced weight under *Universal Camera.* See, e.g., *Kopack v. NLRB and Vogt-Conant Co.,* 668 F.2d 946, 954 (7th Cir. 1982). The ALJ chose to accept Thomas' version on his analysis of the evidence. We do note that although the ALJ recited in the beginning of his opinion that his conclusions were based upon the entire record, including his "observation of the witnesses" and consideration of the briefs, he never made any mention of demeanor in his detailed comparison of Thomas' and Gann's testimony. Under these circumstances an ALJ's general preliminary recitation, of a boilerplate nature, that observation of witnesses was a factor in the judge's conclusion should not transform every testimonial evaluation into a credibility determination based on demeanor.

■ In this case, as noted above, the credibility determinations rest, not on demeanor of which the judge was the sole observer, but on an analysis of testimony. Therefore in this case credibility determinations deserve less than usual deference. As the Court stated in *NLRB v. Interboro Contractors, Inc.,* 388 F.2d 495, 501 (2d Cir. 1967):

> The examiner does not state that his credibility findings were based on demeanor, and while they may well have been influenced by the demeanor of the witnesses, a reading of the examiner's opinion supports the conclusion that the credibility findings purport to rest mainly on an analysis of the testimony. In these circumstances, it seems that the Board

may properly give the credibility findings less weight than would be required in a case where those findings were explicitly based on demeanor.

Because of the grounds upon which we ultimately decide this case, we will not lengthen this opinion by a detailed analysis of the four bases upon which the ALJ chose to rest his determination of Thomas' version as being more credible. We do say that the analysis was not without its flaws. We also note that the ALJ did address on an arguendo assumption the possibility that Gann *did* indicate he would have to hold it open because the union had indicated the need to do so for approval. Although we are not addressing the specifics of the ALJ's analysis, as noted above, we have considerable doubt as to the correctness of this particular analysis. Irrespective of whether keeping the matter open does not constitute a revocation as the ALJ found it did not under 1 S. Williston, Contracts § 55 at 178 (3d ed. 1957), we do not think this is the matter before us. We think the only fair reading of the testimony of Gann was not that he would keep the offer open but rather that he was holding the entire approval open. We read his testimony as meaning that he was indicating that the company would not be bound until it was finally determined by both parties that approval was appropriate.

We also note as one of the troubling aspects arising from our consideration of the entire record that Gann never wavered in his testimony that Thomas had said he would hold the matter open for committee review and that Gann, in turn, had said he would have to hold "it" open also. On the other hand, Thomas' testimony frequently varied. In the hearing before the ALJ, Thomas first denied that he had ever mentioned the committee's absence or his need to get their opinion. He then testified, "Myself and the committee work very closely, and as soon as we got out of the meeting I was going to bring it up to the committee." Thomas then revised his position, ex-

plaining that he had decided that it was within his "power as president to make the decision." Ultimately, Thomas said that he could not even recall whether or not he had just testified that after the meeting he had intended to meet with the committee on the policy. In the earlier federal court hearing when asked if Gann had said he would have to keep the matter open, Thomas said, "I can't recall if he did." Moreover, the full union committee had been present for the January 17 and 18 meeting, which suggests that their approval was a usual prerequisite to an agreement. In the hearing when Thomas was asked if it was his usual practice to check with the committee for an agreement, he responded, "Any agreements that I make, yes, the committee is usually always there."

As an alternative ground of the Board's decision it was held in any event there was an unconditional offer insofar as Gann was concerned on January 23 and the union manifested acceptance on January 24 when the entire committee appeared at Gann's office at the appointed time for signing the agreement. Further the Board held in accordance with the ALJ's findings that on January 25 the union again sought out the agreement from Gann and again manifested its acceptance of the agreement.

The flaw in this approach is that the record clearly demonstrates to us that Thomas no more was ready to sign, on any of these dates, an agreement that he had never seen on paper than he was on January 17, or January 18. On both dates he purportedly had "agreed" but had subsequently reneged. On the first time he did so because the membership refused to accept the agreement as his notes showed it and on the second time because of his misgivings over his own understanding of the

agreement. This is a matter simply of elementary contracts law, and area in which this court upon reading the entire record is as well equipped as the Board to determine whether or not there was a meeting of the minds. This is not the troublesome question of whether a binding contract has been entered into with a written statement of that contract to follow or whether no binding agreement has been entered until the writing itself has been executed. *See* 1 S. Williston, Contracts § 28 at 66 *et seq.* (3d ed. 1957).

█ Here we think beyond the peradventure of a doubt the record demonstrates that Thomas, despite his protestations to the contrary in the later labor board hearing, reserved his right to find fault and disclaim any phrase or part of the oral agreements, or indeed all of it, until he had approved the actual writing and signed it. That being so there was no final meeting of the minds and no binding agreement.[4] We have reached this conclusion on Thomas' testimony alone, and because of the conclusion we have reached we find and hold that the Board's decision was not supported by substantial evidence.

Accordingly, review is granted and enforcement is denied.

---

4. The ALJ was not unmindful of the reasonable inference created by Thomas' on-again, off-again acceptances that no binding agreement would legally exist until there was a document signed by both parties. Indeed, in his decision he noted that the company's argument on this issue was supported by the record and had "a certain subjective appeal." He declined, however, to give full effect to those undisputed facts on the basis that they would only be germane if the issue was whether or not there had been good faith bargaining. We think the facts have an equal application to whether the parties had reached an agreement on all of the provisions of a policy and decline to limit their application as did the ALJ.