**SIOUX PRODUCTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–2356.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1982.

Decided Aug. 2, 1982.

Lawrence J. Casazza, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for petitioner.

James D. Donathen, Elliott Moore, NLRB, Washington, D. C., for respondent.

Before CUMMINGS, Chief Judge, NICHOLS, Judge,* and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

This case is before us on petition for review of Sioux Products, Inc. ("Sioux") and the cross-application of the National Labor Relations Board (the "Board") for enforcement of the Board's decision and order reported at 257 N.L.R.B. No. 56 (1981). In that decision and order, the Board affirmed and adopted the findings of the Administrative Law Judge ("ALJ") that Sioux unlawfully interrogated employees about their union activities and threatened to eliminate profit sharing if the employees approved a union as their bargaining representative (alternatively promising to retain profit sharing and grant pay raises if the union was not so approved). The Board, in affirming the ALJ, also found that Sioux threatened to fire employees and create problems with immigration authorities if they supported the union. All these activities were held to be in violation of section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) (1976). The Board also adopted the ALJ's finding that Sioux unlawfully reprimanded and discharged employee Julia Arroyo in violation of sections 8(a)(1) and 8(a)(3) of the Act. We conclude that substantial evidence on the whole record supports the Board's decision and order except with respect to alleged interrogation of certain union leaders in Sioux's plant, and we thus enforce the Board's order as modified.

I.  *Section 8(a)(1) Allegations*

Sioux produces various injection molded plastic parts at its suburban Chicago plant, employing 110 workers—most of whom speak Spanish as their primary or only language—during the times relevant here. A majority of these employees voted in favor of representation by the Production Workers Union of Chicago, Local 707, at an election held on February 1, 1980.[1] The various alleged section 8(a)(1) violations forming the basis of the Board's action in this case occurred during the union representation campaign which preceded the February 1 election.

■ Before considering the specific incidents involved in the alleged section 8(a)(1) violations, we note that the Board's findings on factual questions, if supported by substantial evidence on the whole record, are conclusive on appeal. 29 U.S.C. § 160(e) (1976); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Several recent decisions of this court have further explicated that standard when factual questions are resolved by the ALJ (and the ALJ's findings are accepted by the Board) relying in part on credibility determinations based upon witness demeanor. "To the extent that the ALJ's decision rests explicitly on his evaluations of demeanor, we are required to weigh those particular findings more heavily." *Kopack v. NLRB*, 668 F.2d 946, 954 (7th Cir. 1982); *accord Consolidation Coal Co. v. NLRB*, 669 F.2d 482, 487–88 (7th Cir. 1982). In this case, several of the ALJ's crucial factual findings were premised upon his demeanor-based assessment of the credibility of opposing witnesses who presented differing accounts of the same events.[2] We have carefully reviewed

---

* The Honorable Philip Nichols, Jr., Judge of the United States Court of Claims, is sitting by designation.

1. We note incidentally that the Board recently found in unrelated proceedings that the union was, as a result of this election, properly certified as the collective bargaining representative of these employees and that Sioux unlawfully refused to bargain with the union in 1981. *Sioux Products, Inc.*, 258 N.L.R.B. No. 35 (1981).

2. We do not place any exceptional weight on the ALJ's *inferential* findings based merely upon his assessment of the evidence, in contrast with findings based upon his assessment of the *demeanor* of witnesses and the relative demeanor-based credibility accorded to those witnesses. In particular, the ALJ here chose to accept the testimony of employees Borgerson, Arroyo, Lopez and Reyes at several crucial points over the contradictory testimony of other witnesses because those four employees, in the opinion of the ALJ, testified in the most candid and straightforward manner. *See* 257

**1254**

all of the ALJ's findings in this case, but, in accord with our decisions in *Kopack* and *Consolidation Coal*, we have placed especial weight on those findings based upon the candor and demeanor of witnesses.

To establish a violation of section 8(a)(1), the Board must demonstrate that the employer's conduct might reasonably tend to interfere with the exercise by employees of rights protected under the Act. *See NLRB v. Illinois Tool Works, Inc.*, 153 F.2d 811, 814 (7th Cir. 1946). With this standard to guide our analysis under section 8(a)(1), we turn to the facts of the instant case involving alleged violations under that section. In this endeavor, we should accept the Board's decision involving violations of the Act unless the evidence on the record as a whole indicates that the Board's decision is unjustified as either a fair interpretation of the evidence or as an informed exercise of the Board's judgment on matters within its area of general competence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

Employees Julia Arroyo and Hilda Reyes testified that on the day before the representation election, the employees were addressed in Spanish by Sioux's translators.[3] The translators told the employees that they would lose profit-sharing and other benefits if the union won the representation election, but that they would retain their profit sharing and receive increased benefits and better "treatment" if the union lost the election. Employees Arroyo and Angelina Lopez also testified that their votes were solicited individually before the election by one of the translators, accompanied by the owner of Sioux, with the same pitch: you will lose your profit-sharing and other benefits if the union wins the election.

Sioux does not argue—nor could it contend—that the employees' testimony, if true, fails to establish a violation of section 8(a)(1). Indeed, threats to take away benefits upon a union victory in a representation election constitutes precisely the type of conduct which is a demonstrable obstacle to the exercise by employees of the free choice guaranteed by sections 7 and 8(a)(1) of the Act. *See First Lakewood Associates v. NLRB*, 582 F.2d 416, 419–21 (7th Cir. 1978).[4] Rather, Sioux asserts that the ALJ (and consequently, the Board) erred by accepting the testimony of Arroyo and Reyes, while rejecting the testimony of the company owner and one of the translators to the effect that, although profit-sharing was discussed with employees, there was no threat

---

N.L.R.B. No. 56 at 12–14; *cf. Consolidation Coal Co. v. NLRB*, 669 F.2d 482 (7th Cir. 1982) (ALJ's findings, although allegedly credibility-based, were not based upon demeanor observations and thus were entitled to no special weight).

**3.** The translators were actually outside "consultants" hired by Sioux after the union drive started to translate management's messages into Spanish. The ALJ found that these Spanish-speaking consultants engaged in general campaigning against the union throughout the union representation drive, and that they were agents of Sioux under section 2(2) of the Act, 29 U.S.C. § 152(2) (1976). 257 N.L.R.B. No. 56 at 11 n.13.

**4.** The Board upheld the ALJ's apparently distinct but unexplained finding that Sioux's promises to increase benefits upon a union defeat constituted a separate violation of section 8(a)(1). *See* Order to be posted by Sioux by direction of the Board, 257 N.L.R.B. No. 56 at 16. The Supreme Court has reasoned that a promise to grant benefits made during a union representation election violates section 8(a)(1) because one may infer from the promise an implied threat to take away benefits if the union wins the election. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Although that inference may not seem plausible in every case where an employer promises benefits to persuade employees to vote against the union, it is evident in this case that the promise of increased benefits made by Sioux was coercive in nature and was utilized to mask Sioux's threat to decrease benefits upon a union victory. Both the promises and the threats made here by Sioux were closely linked in time and circumstances as part of Sioux's otherwise coercive efforts to discourage support for the union. In such a case, it is preferable to analyze the promise of benefits as violating section 8(a)(1) because it is so closely associated with threatening conduct rather than to rely on inferences and assumptions about how an employee may have interpreted the promise. It is with this understanding that we enforce this portion of the Board's order since neither the Board nor the ALJ explained the basis for their decisions.

to eliminate that benefit as a result of a union victory.

But the ALJ's appraisal cannot be upset on this basis. The ALJ carefully explained that Arroyo, Reyes and Lopez were more candid and straightforward in their testimony than Sioux's witnesses—and as we indicated above, this demeanor-based credibility determination is entitled to considerable weight. Moreover, the ALJ inferred from other facts that the testimony of the three employees more likely approached the truth than the contradictory testimony of Sioux's witnesses. For example, two of the employee witnesses (Reyes and Lopez) testified under subpoenas from the General Counsel; the ALJ noted that these witnesses, who were still employed by Sioux, did not "appear[ ] anxious to testify on behalf of [the] General Counsel against Respondent [Sioux]," and thus, their testimony was more believable. 257 N.L.R.B. No. 56 at 12. Sioux's translator, on the other hand, was originally hired to counter the union drive and the ALJ inferred from that fact that he probably testified in a manner consistent with the purpose for which he was employed; the company owner's testimony was unbelievable in part, according to the ALJ, because the owner did not speak Spanish and thus did not know precisely what the translator told the employees in Spanish. In such circumstances, we find no reason to fault the ALJ's findings of fact about the threats to take away benefits since these findings are, in our view, well supported by substantial evidence.

Several employees, including Marta Arroyo, Silvina Andrade, Angelina Lopez and Humberta Lopez, also testified that in various meetings with Sioux's management personnel and translators, they were threatened with loss of jobs, shorter working hours, strikes, and plant shutdowns if the union won the election. The employees further testified that they were told that those employees lacking proper immigration documents would be either fired or picked up by immigration authorities if the union won the election. Sioux cannot, of course, deny the illegality of such threats if they were indeed communicated to its employees. *Cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (employer coerced employees in violation of section 8(a)(1) by predicting adverse consequences, not based on objective facts beyond employer's unilateral control, upon unionization).[5] Rather, Sioux again argues that the ALJ improperly accepted the employees' testimony and rejected the contradictory testimony of Sioux's witnesses.

We believe that the ALJ properly credited the testimony of employees Marta Arroyo, Angelina Lopez and Humberta Lopez and correctly found that the statements attributed to Sioux violated section 8(a)(1). Although the ALJ's determination here was not based upon demeanor evidence and thus is not entitled to exceptional weight under our *Consolidation Coal* decision, the ALJ nonetheless satisfactorily explained why he chose to believe some testimony and disbelieve other testimony, and we are unable to fault his determinations as lacking substantial evidentiary support. The ALJ accepted the testimony of Arroyo and the two Lopezes because Borgerson, whom the ALJ regarded as Sioux's most unbiased witness (*see* note 9, *infra*), testified inconsistently; Gibson, the personnel manager, was too closely tied to Sioux's interests in the case; and, translator Garza, a third potential witness, was not called by Sioux to refute the allegations made by Angelina and Humberta Lopez. In the absence of consistent, unbiased testimony to the contrary, we

5. Sioux's reliance upon *Utrad Corp. v. NLRB*, 454 F.2d 520 (7th Cir. 1972), is misplaced. In *Utrad*, the court held that an isolated statement by a foreman made without the knowledge or acquiescence of higher management authority and threatening a plant closing upon a union victory did not violate section 8(a)(1). Here, on the other hand, the statements were made both by Sioux's personnel manager and by the translators interpreting directly for the company owner; moreover, the numerous statements threatening loss of jobs and troubles with immigration authorities were far from isolated.

ought not to disapprove the Board's acceptance of the ALJ's findings.[6]

The final section 8(a)(1) violation alleged here involved interrogation by Sioux's translator, John Garza, of employees Eulogio Arroyo, Marta Arroyo and Julia Arroyo. The Arroyos testified that on separate occasions Garza asked each of them whether they planned to vote for the union. Eulogio Arroyo testified that Garza also asked him after the election whether he had actually voted for the union. Garza did not appear or testify at the hearing. In contrast to his otherwise detailed analysis of the facts and law on other matters, the ALJ here simply and cryptically concluded that the employees testified credibly that Garza did not refute their assertions and that Garza's actions therefore "constitute[d] interrogation in violation of Section 8(a)(1) of the Act." 257 N.L.R.B. No. 56 at 13 (footnote omitted).

■ We disagree. Even if we accept as true the employees' testimony that Garza asked them whether they would vote, or had voted, for the union, we cannot find that these remarks reasonably tended to "interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7 [of the Act]." 29 U.S.C. § 158(a)(1) (1976). Interrogation[7] of employees is not per se violative of the Act. "To fall within the ambit of § 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference." *Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1267 (7th Cir. 1980); *accord NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679 (7th Cir. 1982). We must strain beyond a normal and realistic sense of the industrial scene to find that Garza's remarks "coerced" these three employees in the exercise of their rights. At least two of the employees were ardent union supporters and were experienced in union representation campaigns. Neither the questioner's identity, nor the nature of the information sought, nor the method of questioning, nor the particular employee-employer relationships involved indicate that these employees tended to be coerced by these statements. Moreover, the ALJ cited no evidence which

**6.** The ALJ also based his finding of illegal threats of job losses and immigration problems in part on the testimony of a fourth employee, Silvina Andrade. We cannot accept the ALJ's rationale for relying on Andrade's testimony and we disclaim any reliance on that testimony here. As part of his decision in another aspect of this case, the ALJ ruled that Sioux properly discharged Andrade shortly after the union election. (The Board accepted the ALJ's finding that Andrade was lawfully discharged and thus, that issue is not before us.) In reaching this conclusion, the ALJ found that Andrade's testimony "strained the limits of believability," conflicted with the testimony of other witnesses, and lacked internal consistency. *See* 257 N.L.R.B. No. 56 at 9. Notwithstanding his rejection of Andrade's testimony on the discharge issue, the ALJ accepted those portions of Andrade's testimony about illegal threats that were not directly contradicted by any other witnesses. In effect, the ALJ accepted Andrade's claim that one of Sioux's translators (John Garza) threatened her with loss of her job because Garza did not testify, but the ALJ rejected all of Andrade's other claims because they were refuted by Sioux's testifying witnesses. The error in the ALJ's approach to Andrade's testimony here was to effectively place the burden of proof on Sioux to refute the testimony of an otherwise admittedly unbeliev-able witness. This approach is erroneous since the burden of proof in a section 8(a)(1) case always rests with the General Counsel. We thus will not allow the ALJ to rely on the unrefuted assertions of a witness otherwise found to be lacking in credibility to support the ALJ's findings under section 8(a)(1). However, our rejection of the ALJ's reliance on the testimony of Silvina Andrade does not change the result since the credible testimony of three other witnesses is entirely adequate to sustain the Board's finding.

**7.** Once a conversation is labelled "interrogation," it is quite easy—indeed, appealing—to find a section 8(a)(1) violation. But the label "interrogation" must be used with some restraint. In this matter, we find little evidence suggesting the kind of coercive interrogation that is proscribed by the Act. Each employee was asked by a known company agent how he would vote or had voted; no threats were made or intimated; the questioning was brief; it is not claimed that any other employees overheard the conversations; and each employee either publically supported the union or was a union leader both before and after the questioning. None of these employees even asserted that Garza's questions coerced or restrained them from exercising their rights.

tended to indicate that other employees may have overheard the alleged "interrogation" and were thus indirectly coerced in the exercise of their rights. As in *Midwest Stock Exchange, supra,* we cannot find any threats, express or implied, in the brief and limited questions Garza put to the three Arroyos. *See* 635 F.2d at 1268. We therefore deny enforcement of that part of the Board's order finding that Sioux unlawfully interrogated the Arroyos about their voting intentions or performance in violation of section 8(a)(1).

## II. *Section 8(a)(3) Allegations*

The alleged section 8(a)(3) violations that are challenged by Sioux involve the issuance of disciplinary warnings to, and the discharge of, Julia Arroyo during February, 1980, shortly after the union election victory. Julia Arroyo actively supported the union during the representation drive and served as a union-appointed observer during the election. Although her disciplinary record for the five year period of her employment at Sioux preceding the election showed only two minor infractions, Arroyo's record after the election, according to witnesses called by Sioux, was replete with rules infractions and other misbehavior that ostensibly prompted Sioux to ultimately discharge her on February 28, one month after the election. Not surprisingly, Arroyo presented a different version of these post-election events. The ALJ carefully untangled a web of snarled testimony, concluding (with the help of an important credibility assessment of Sioux's employee-witness, Borgerson) that Julia Arroyo's discharge was prompted by her involvement in protected activities and was not justifiable as a response to charges of misconduct proffered by Sioux. We think that the ALJ correctly identified the motive for the discharge.

■ Before examining the facts surrounding Julia Arroyo's discharge, we note that the burdens of proof assigned, respectively, to Sioux and to the Board in a "mixed motive" section 8(a)(3) case like this were set out in our recent opinion in *Peavey Co. v. NLRB,* 648 F.2d 460 (7th Cir. 1981),

and are further explicated by the First Circuit's recent decision in *NLRB v. Wright Line, Division of Wright Line, Inc.,* 662 F.2d 899 (1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 1612 (1982). Under the *Peavey/Wright Line* standard, the Board, to establish a prima facie violation of section 8(a)(3), must first show that the employee's protected activities were a motivating factor in the employer's action affecting the terms and conditions of employment. The employer may rebut this prima facie showing with evidence indicating that the same action would have been taken even in the absence of the employee's protected activities. The Board, which always carries the ultimate burden of persuasion, must then establish that the discharge was motivated by the employee's protected activities, demonstrating, for example, that the employer's asserted justification is pretextual or could not support the action taken by the employer. But even when using this analysis, we note that a reviewing court is bound to a substantial evidence standard and may not reject, absent the most exceptional circumstances, properly supported findings of fact—especially findings derived from a demeanor-based evaluation of credibility made by the judge who heard the testimony.

■ In this case, the evidence reveals that various conflicts over unionization arose among employees, even after the union's victory in the February 1 representation election. On February 5, Sioux's personnel manager, Carol Gibson, was told by employee Maricella Ramos (admittedly an opponent to the union) that Julia Arroyo was harassing another anti-union employee, Jeanete Bojorquez. Gibson testified that Bojorquez told her that Arroyo and another pro-union employee were bothering some of the other employees with regard to the union; Arroyo and Bojorquez allegedly engaged in a " 'screaming match' " in the ladies' washroom concerning Arroyo's authority to " 'fire' " employees because of Arroyo's position with the union. 257 N.L.

R.B. No. 56 at 4.[8]  After hearing this report Gibson conferred with Sioux's general manager, Jay Maher, and they then held a meeting in Gibson's office to " 'nip this in the bud' " before a " 'brawl' " started.  *Id.*

At the meeting in Gibson's office, all of the employees involved in the altercation were warned verbally, according to Maher and Gibson, to stop bickering among themselves and to go back to work.  Maher testified that Gibson also warned the employees that future outbursts of this sort would result in discharge.  The written notations placed in the files of each employee subsequent to this meeting, however, suggest a much less evenhanded handling of the problem.  Thus the files of the two pro-union employees, including Arroyo, show that they were reprimanded for " 'antagonizing & intimidating employees' " and were warned " 'next offense—discharge.' " *Id.* at 5.  The file of the anti-union employee Bojorquez, on the other hand, read: " 'Involved in dispute with Julia Arroyo, Maria Anaya and Anna Garcia over Union.  Although on receiving end and not one of the aggressors—all girls to air their differences on the outside.' "  *Id.*  These file notations are even more suspect in that the hearing showed that neither of the two employees (other than Bojorquez) allegedly harassed by Arroyo complained to management, and one of these employees even told Gibson during the office meeting that she had no complaint against Arroyo.

On February 12, Julia Arroyo received another disciplinary warning, this time from her immediate supervisor, Jackie Haltmeyer, for leaving her work station to go to the bathroom without seeking permission.  Sioux's witnesses testified that this rule is contained in the employee handbook; Julia Arroyo admitted that she had a copy of this handbook.  However, Arroyo and other witnesses testified that it was shop policy and practice for employees to go to the bathroom without seeking permission.  One of Sioux's witnesses, employee Roci

Andrade, testified that Arroyo went to the bathroom without permission (and without incident) before the union election, and supervisor Haltmeyer further admitted that she allowed employees to go to the lunch truck without seeking permission, in apparent violation of the employee handbook.

The final incident occurred on February 28.  Employee Roci Andrade (admittedly a union opponent), accompanied by supervisor Haltmeyer and employee Maricella Ramos (who translated), complained to Gibson that Julia Arroyo pushed her and twice called her, in its Spanish equivalent, a "son-of-a-bitch."  Gibson then told the plant's general manager, Maher, that Arroyo would have to be fired or else there would be a "riot" on the plant floor.  Gibson said she was going to tell the company owner of her decision to fire Arroyo.  Maher concurred in Gibson's decision, although he told Gibson to find other witnesses to the pushing incident before reporting it to the owner.  Gibson then called into her office two employees who, according to the accusing employee, Andrade, also witnessed the incident.  Although both of these employees told Gibson that they did not see Arroyo either push Andrade or use profane language in Andrade's presence, Gibson did not change her mind about firing Arroyo.  Indeed, Gibson never bothered even to seek out Arroyo to hear Arroyo's side of the story.  Gibson went to the owner, secured his permission to fire Arroyo, and then returned to her office.

Notwithstanding the asserted need to prevent an impending "riot" on the plant floor, Gibson waited until the end of the shift to fire Julia Arroyo.  The ALJ heard conflicting testimony about what was said and done in the meeting in Gibson's office at the end of the shift when Arroyo was fired.  In a crucial credibility determination based in part on demeanor and based in part on inference, the ALJ accepted the testimony of Sioux's own witness, supervisor Brent Borgerson (who acted as a translator at this meeting), which tended to support Julia Arroyo's version of the facts and

---

**8.** Bojorquez did not testify; her alleged remarks were presented as hearsay evidence through Gibson.

contradicted the testimony of Maher and Gibson. 257 N.L.R.B. No. 56 at 8 n.6.[9] Borgerson testified that he was given a "ticket" to read to Arroyo immediately after she entered Gibson's office, that the ticket was a dismissal notice and that Arroyo was not allowed to present her side of the story before receiving the dismissal notice. Although Maher testified that Julia Arroyo admitted in this meeting that she pushed Andrade, Borgerson supported Arroyo's claim that she denied pushing Andrade.

We believe that substantial evidence supports the Board's finding that Sioux discriminated against Julia Arroyo through its discipline and discharge of her because of her union conduct, and Sioux has failed to support its claim that Arroyo would have been similarly disciplined notwithstanding her protected activities. Sioux's discipline of Arroyo revealed, as the ALJ found, a clear pattern: a complaint by either an anti-union employee or a supervisor about misconduct by Arroyo; no investigation of Arroyo's side of the story, and the ignoring of evidence in her favor; discipline of Arroyo but no discipline of anti-union employees involved in the same misconduct; the occurrence of all the events shortly after the union victory and the involvement of employees and supervisors with strong animus against union representation. Even when accusations against Arroyo were not fully supported by either the employees involved (February 5) or the alleged employee witnesses (February 28), Sioux still disciplined—and even discharged—Arroyo. We agree with the ALJ and the Board that the asserted justifications for Sioux's actions are pretexts to disguise disciplinary action for protected activities.

Moreover, Sioux's actions against Arroyo are further stripped of legitimacy by the very procedure followed in decreeing discharge. Thus, although Gibson admitted that her customary method of handling misconduct complaints was to talk to all involved employees before imposing discipline, she did not talk to Arroyo before deciding to fire her on February 28. Finally, the strikingly disparate warnings issued to the various employees involved in the trivial incidents of February 5 and 12 reveal a disposition on the part of Sioux to utilize even the pettiest infractions to build a record against an apparently unpopular union supporter, whom they wanted to fire. In sum, we agree with the ALJ that Arroyo was disciplined and discharged because of her union activities in violation of section 8(a)(3). The ALJ and the Board sifted the facts and articulated their premises and reasoning so carefully that it would be error for us to disturb the result.

## III. *Conclusion*

The order of the National Labor Relations Board is enforced in all respects except insofar as it found a violation of section 8(a)(1) based on alleged interrogation of Sioux's employees, Eulogio, Marta and Julia Arroyo.

ENFORCED AS MODIFIED.

---

**9.** The inference relied on by the ALJ is a rather strong one. Borgerson was a supervisor, called as a witness by Sioux, who assisted Sioux's witnesses and counsel throughout the hearing as a translator. The ALJ concluded that Borgerson would be unlikely to testify knowingly in a false manner to the detriment of his employer.