15 F.3d 1088
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Nicolas Antonio REYES-HERRERA, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 92-70430.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 10, 1993.
Decided Jan. 21, 1994.
As Amended on Denial of Rehearing
April 29, 1994.
 
 Before: CHOY, TANG, and D.W. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Nicolas Antonio Reyes-Herrera petitions this court for review of the Board of Immigration Appeals' ("BIA") decision upholding the Immigration Judge's denial of asylum and withholding of deportation under 8 U.S.C. Secs. 1158(a), 1253(h) (1988). We have jurisdiction under 8 U.S.C. Sec. 1105(a). We reverse the BIA's decision, and conclude that Reyes-Herrera is eligible for withholding of deportation, and a fortiori, asylum.
 
 I. Factual and Procedural Background
 
 3
 Reyes-Herrera is a twenty-eight year old citizen of El Salvador from the town of Maferre. He lived with his brothers and sisters in the family home, located about seven blocks from the headquarters of the Sixth Brigade, an El Salvadoran national army unit. From 1984 until mid-August 1991, he worked as a boat carpenter for the Atarraya fishing company in Puerto El Triunfo, about an hour away from Maferre.
 
 
 4
 Reyes-Herrera was a member of El Salvador's second largest political party, the Christian Democratic Party, also known as the PDC. The largest party in El Salvador, the ARENA party, is currently in power. In Maferre, only fifteen residents in a population of approximately 5,000 are PDC members. Reyes-Herrera joined the PDC in March 1991 and was assigned to the propaganda section of the local chapter. He was responsible for painting posters and walls with PDC slogans and handing out PDC political flyers.
 
 
 5
 Reyes-Herrera was also a member of the Atarraya Fishing Industry Union, the Sindicato de la Industria Pesquera. When he began working at Atarraya he was employed part time. About two and a half years before he left El Salvador, he was promoted to permanent status and therefore became eligible to join the company's union. He then attended union meetings and participated in a three-month union sponsored strike that ended in August, 1991. However, he testified that he did not "join" the union until August 1991, when his friends at the company who were union members requested him to assume a position of union responsibility.
 
 
 6
 In early August 1991, when the strike was over and the fishing company resumed operations, new employees were hired at Atarraya. Reyes-Herrera observed these employees bringing weapons into the company and suspected that they were guerillas. He reported this activity to the Secretary General of the union, Fredy Antonio Novellino Rodriguez ("Novellino"), who then instructed Reyes-Herrera to assist the guerillas. When Reyes-Herrera refused, Novellino told him that if he did not help the guerillas, he would be "disappeared."
 
 
 7
 Reyes-Herrera testified that from late July, 1991, until his departure from El Salvador in mid-August, 1991, approximately six threatening letters addressed to him were slipped under the door of his family's house at night. The letters bore the stamp of the Sixth Brigade, the army group based in Maferre. The first letters asked Reyes-Herrera to present himself at the Sixth Brigade base for interrogation. In late July, soldiers came to the Herrera home and blindfolded, beat, and tortured Reyes-Herrera's brother. Reyes-Herrera testified that they did this because he had not presented himself to the Sixth Brigade as the letters had ordered. Following the beating, Reyes-Herrera left the family home at the request of his brother.
 
 
 8
 He subsequently went to live with a friend in Puerto El Triunfo, and on or about August 10, the Sixth Brigade delivered another letter addressed to Reyes-Herrera to his home, which a friend brought to him at work. The letter, the last he would receive, again ordered him to present himself, and stated that if he refused, he would be "disappeared." Reyes-Herrera testified that the army sought him because of his PDC and union membership, and because they suspected him to be a guerilla.
 
 
 9
 After receiving this letter, Reyes-Herrera decided to leave the country, and on August 15, he returned to Maferre to say goodbye to his family. At approximately 9:00 p.m., as he was returning to his house, he was followed by a group of men who opened fire on him with automatic rifles.
 
 
 10
 After this attack, army soldiers came to Puerto El Triunfo and looked for Reyes-Herrera at Atarraya, but since he was not at work that day, he escaped detection. When he learned from a friend from work that the army had been searching for him, he fled to San Salvador, and one week later, he left El Salvador and came to the United States. Reyes-Herrera was apprehended in Texas by the Immigration and Naturalization Service, and in order to prevent immediate deportation, he filed an action requesting withholding from deportation and asylum.
 
 
 11
 On December 13, 1991, the Immigration Judge found that Reyes-Herrera had failed to demonstrate a well-founded fear of persecution, denied his application for asylum and withholding of deportation, and ordered him deported to El Salvador. The Immigration Judge found that Reyes-Herrera's testimony was not credible, and that even assuming the testimony were credible, Reyes-Herrera had failed to show that he had been persecuted because of his political opinion rather than because of a legitimate government interest in pursuing suspected guerillas. Reyes-Herrera then appealed this decision to the BIA.
 
 
 12
 On January 20, 1992, Reyes-Herrera received a letter from a friend in Puerto El Triunfo informing him that his sister had been killed, found dead one day after the authorities visited the Herrera home. Reyes-Herrera's friend went to Maferre to try to locate the family, but was told by neighbors that they had fled and their whereabouts were unknown.
 
 
 13
 Reyes-Herrera supported his appeal to the BIA with a declaration containing the letter regarding his sister's death, two letters confirming his membership in the Atarraya union (which were received one day after his hearing before the Immigration Judge), and a statement attempting to explain his testimony before the Immigration Judge regarding the date he became an active union member. One of the letters confirming his union membership was written by the union leader, Novellino, who had warned Reyes-Herrera to help the guerillas or be "disappeared," while the other was submitted by the El Salvadoran federal government. Both letters confirmed that Reyes-Herrera has been a registered member of the union since April 12, 1988.
 
 
 14
 Reyes-Herrera stated in his declaration that when the Immigration Judge asked him about the date he joined the union, he thought he was being asked the date he became active in the union. He stated that although he became active and assumed a position of responsibility in the union in August, 1991, employees typically became union members when they obtained full-time positions with the company. Reyes-Herrera told the Immigration Judge that he "joined" the union in August, 1991 because that was when he became an active leader of the union.
 
 
 15
 On April 13, 1992, the BIA issued a written decision affirming the Immigration Judge's decision and dismissing Reyes-Herrera's appeal. In its decision, the BIA adopted the Immigration Judge's adverse credibility findings, and offered additional reasons as to why it did not consider Reyes-Herrera's testimony to be credible. In addition, the BIA agreed with the Immigration Judge's determination that even assuming the truth of the testimony, Reyes-Herrera had failed to demonstrate that he had a well-founded fear of persecution because of his political opinion. The BIA held that the army had a legitimate right to investigate and detain Reyes-Herrera as a guerilla suspect. Reyes-Herrera then filed this petition for review.
 
 II. Discussion
 
 16
 In finding that Reyes-Herrera had failed to establish a well-founded fear of persecution, the BIA based its decision on its conclusion that Reyes-Herrera had not testified in a credible fashion.[1] The BIA made its own specific adverse credibility findings, and also adopted those of the Immigration Judge. Because we find these credibility findings are not supported by substantial evidence, we are compelled to conclude that Reyes-Herrera is eligible for withholding of deportation.
 
 
 17
 Reyes-Herrera stated that he lost the documentation proving that he was a union member on his way to the United States, and the Immigration Judge claimed this excuse was too convenient to be believable. The BIA agreed. However, following his first hearing, Reyes-Herrera received letters confirming his union membership.
 
 
 18
 The Immigration Judge also found, and the BIA agreed, that it was implausible that the army would seek to harm Reyes-Herrera for minimal activity in El Salvador's second largest political party. This conclusion ignores the evidence in the record which shows that the ruling ARENA party brutally persecutes members of the Christian Democratic Party throughout El Salvador. In addition, Reyes-Herrera's role in the party cannot be construed as "minimal." He was assigned the task of hanging party posters throughout Maferre and painting party slogans on walls--an extremely visible role.
 
 
 19
 Although the BIA adopted the Immigration Judge's finding that it is illogical that the army would seek to harm Reyes-Herrera because of his minimal and brief union activity, the evidence in the record does not support this finding. Instead, it shows that labor union members are frequently viewed by the ruling ARENA government and the military to be guerilla sympathizers, and that widespread persecution has been directed against all levels of union members over the past decade. In addition, Reyes-Herrera testified repeatedly that the government suspected him to be a guerilla because of his union membership.
 
 
 20
 The BIA ignored the advisory opinion, obtained by the Executive Office for Immigration Review from the Bureau of Human Rights and Humanitarian Affairs of the Department of State, which recognized that there are credible reports that the El Salvadoran government persecutes union members solely on their membership in a union that is suspected of supporting FMLN guerrillas. See Zavala-Bonilla v. INS, 730 F.2d 562, 567 (9th Cir.1984) (BIA erred by failing to consider State Department advisory opinion which supported El Salvadoran union member's asylum claim, especially because "Salvadoreans rarely receive a State Department opinion supportive of a political asylum application.")
 
 
 21
 The BIA also adopted the Immigration Judge's finding that it made no sense that the army would know Reyes-Herrera was a union member but would be unable to determine where he worked. However, as the record shows, the army did know where Reyes-Herrera worked, because after he left Maferre, they came looking for him at his workplace in Puerto El Triunfo.
 
 
 22
 The BIA found it implausible that Reyes-Herrera's supervisor would have waited until August, 1991 to demand that he assist the guerillas, because the union had been composed of guerillas since 1988. This conclusion is based on an erroneous interpretation of the evidence. Reyes-Herrera testified that the guerillas did not infiltrate the union until August of 1991, precisely the time Novellino ordered him to assist them.
 
 
 23
 Although the BIA mentioned that the letter regarding Reyes-Herrera's sister's death was postmarked from Miami, thereby implying that the letter wasn't really from El Salvador, the letter was postmarked by a Spanish language express company in Miami. Given the tragic news it conveyed, it makes sense that Reyes-Herrera's friend would use an express company to send it, and this action does not cast doubt on Reyes-Herrera's credibility. Likewise, while the BIA found it only speculation that the men who opened fire on Reyes-Herrera were army members because the shooting took place at night, this is not a sufficient reason to discredit Reyes-Herrera's testimony. Furthermore, the BIA found the torture of Reyes-Herrera's brother insignificant because he was not permanently injured and was allowed to leave. We refuse to disregard this evidence simply because Reyes-Herrera's brother survived his persecution.
 
 
 24
 Finally, we do not consider Reyes-Herrera's testimony regarding the date on which he joined the union, nor the support letter from Novellino, to be sufficient reasons to find that his overall testimony lacked credibility. Where there is no logical manner in which an inconsistent statement would benefit the applicant's claim, the inconsistency is not a reasonable basis for a negative credibility finding, see Demaize-Job v. INS, 787 F.2d 1332, 1337 (9th Cir.1986), and this is especially true when the inconsistent statements refer to dates. See Martinez-Sanchez, 794 F.2d 1396, 1400 (9th Cir.1986). Moreover, Reyes-Herrera explained to the BIA that he believed he was asked when he became active in the union (in August, 1991), rather than when he joined the union (in April, 1988). This is consistent with Reyes-Herrera's testimony that there were only 12 union members in an organization with 300 employees; Reyes-Herrera was undoubtedly referring to those members active in the union.
 
 
 25
 Furthermore, it would make sense for Novellino to support Reyes-Herrera by sending the confirmation letter, because by fleeing the army, Reyes-Herrera demonstrated an anti-government stance of which a guerilla sympathizer would approve. The support letter is not a sufficient reason to find Reyes-Herrera's testimony not credible, particularly in light of the serious nature of the persecution which Reyes-Herrera claimed he experienced.
 
 
 26
 Therefore, we find that the credibility findings of the BIA are not supported by substantial evidence. When the Immigration Judge provides specific reasons for questioning a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible. [Quotation omitted.].... We do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and determine whether the reasoning employed by the fact finder is fatally flawed. Aquilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir.1990).
 
 
 27
 We are compelled to conclude that Reyes-Herrera has sufficiently demonstrated the requisite fear that he would be persecuted because of his political opinion if returned to El Salvador. Elias-Zacarias, --- U.S. ----, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). His testimony established that both he and at least one of his family members had experienced substantial persecution, and that this persecution was predicated on his membership in both the Christian Democratic Party and the Atarraya union.
 
 
 28
 While the BIA found it only speculation that the men shooting at Reyes-Herrera were members of the army, it is not speculation that a letter was sent to Reyes-Herrera, ordering him to either present himself or be "disappeared." Nor is it speculation that the army was so intent on apprehending Reyes-Herrera that they tortured his brother in an attempt to force Reyes-Herrera to obey their requests, and searched for him at his workplace as soon as they realized that he had left Maferre. Because the government backed army is his source of persecution, we do not believe he could safely relocate to another area of the country. See Blanco-Lopez v. INS, 858 F.2d 531, 534 (9th Cir.1988). We conclude that Reyes-Herrera has a reasonable fear of persecution because he would more likely than not be persecuted if returned to El Salvador. Therefore, he is eligible for withholding of deportation and, a fortiori, asylum.
 
 
 29
 Furthermore, the BIA erred when it concluded that Reyes-Herrera would not be persecuted because of his political opinion, but rather out of a legitimate government interest in pursuing a suspected guerilla. The government of El Salvador cannot legitimately persecute a person whom it merely suspects to be a guerilla. See Maldonado-Cruz v. INS, 883 F.2d 788, 792 (9th Cir.1989). Where there is no evidence in the record of an actual, legitimate, criminal prosecution, the government's detention of the alien, or threats, cannot be characterized as legitimate prosecution. See Blanco-Lopez, 858 F.2d at 534. Here, the government's threat to "disappear" Reyes-Herrera cannot be considered legitimate. Therefore, Reyes-Herrera was persecuted because of his membership in the union and imputed political opinion.
 
 
 30
 For these reasons, we conclude that Reyes-Herrera is eligible for both withholding of deportation, and a fortiori, asylum. Id. The decision of the BIA is REVERSED, and Reyes-Herrera's petition for withholding of deportation is GRANTED. Reyes-Herrera's petition for asylum is REMANDED for the exercise of the Attorney General's discretion should petitioner elect to go this route.[2]
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The INS claims the Immigration Judge's credibility findings which the BIA adopted should be given deference because they were based on demeanor. However, because the Immigration Judge made only a brief, general reference to Reyes-Herrera's demeanor, his decision is not entitled to deference. See Kopack v. N.L.R.B., 668 F.2d 946, 956 (7th Cir.1982); Consolidated Coal Co. v. N.L.R.B., 669 F.2d 482 (7th Cir.1982)
 
 
 [2]
 See Aguilera-Cota v. INS, 914 F.2d 1375, 1384 (9th Cir.1990)